ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SENSITECH INC. AND DONALD W. BERRIAN<br><br>Plaintiff,<br><br>v.<br><br>TIME & TEMPERATURE COMPANY, d/b/a TIME 'N TEMPERATURE CORPORATION<br><br>Defendant. | Civil Action No. 04-11483 (MLW) |

**DECLARATION OF BUDD T. POHLE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TO TRANSFER VENUE**

I, Budd T. Pohle, declare:

1. I am a party to this action and am over the age of eighteen (18) years old. I make this declaration of my own personal knowledge or on information and belief where so stated. If called as a witness, I could and would competently testify to the truth of the matters asserted herein.

2. I am the President and Chief Executive Officer of Time 'N Temperature Company ("Time 'N Temperature"). My job responsibilities include oversight of Time & Temperature's day-to-day operations, as well oversight of Time & Temperature's product development, manufacturing, sales, advertising, and marketing in the United States. Time & Temperature is a California corporation with its principal place of business located in Ventura, California.

1

3. Time 'N Temperature has a total of ten full-time employees. Of those ten employees, only two are management personnel. The company's management employees are myself (now over 80 years old), and Janet Williams, the company's operations manager. Time 'N Temperature has a single office in Ventura County, California. Time 'N Temperature has no offices, personnel or representatives of any kind in Massachusetts.

4. From reading Sensitech's opposition to Time 'N Temperature's motion to dismiss, I have learned that Sensitech now alleges that Time 'N Temperature's SmartChek and QC Max temperature recorders infringe U.S. Patent No. Re. 36,200. The SmartChek and the QC Mac were designed and developed by myself and Ms. Williams with assistance from outside consultants and suppliers to the company.

5. Time 'N Temperature introduced the SmartChek to the market in 1996 and introduced the QC Max in 2003. Ms. Williams and I were aware of Sensitech's recorders at the time we designed the SmartChek and we took great care to develop a new recorder that was unlike Sensitech's products. We included features in the SmartChek that were in demand by shippers of perishable foods and were not found in any of Sensitech's products. To my knowledge, within about one year of the SmartChek's introduction, Sensitech copied or incorporated one of the SmartChek's features (an LCD indicator) into their own products.

6. I have read Sensitech's Opposition and am aware that Sensitech states that it sent Time 'N Temperature a letter in 2001 offering to license its patents. I am further aware that Sensitech alleges that Time 'N Temperature failed to substantively respond to this letter. This is simply not correct. As detailed in paragraphs 8 through 10 of my declaration of August 6, 2004, in January of 2001, Time & Temperature received a letter

from Sensitech offering to license three patents and stating nothing more. This letter neither stated nor implied that Sensitech believed that Time 'N Temperature was infringing any of its patents. A true and correct copy of Sensitech's letter of January 16, 2001 is attached to this declaration as Exhibit "A."

7. On or about March of 2001, Time & Temperature received a second letter dated February 28, 2001, requesting a response to the letter of January 16, 2001. Since Sensitech's letter of January 16, 2001, merely offered patents for license and did not request that Time & Temperature do, or not do, anything, I was perplexed by this second letter and therefore referred both letters to Time & Temperature's general counsel (the Law Offices of Lowthrop, Richards, McMillan, Miller, Conway & Templeman) for response. A true and correct copy of Sensitech's letter of February 28, 2001 is attached to this declaration as Exhibit "B."

8. At my direction, in a letter dated March 6, 2001, Time & Temperature's outside general counsel responded to Sensitech's two letters and requested a clarification of the purpose of the letters. Sensitech never responded to this letter. A true and correct copy of Time and Temperature's general counsel's letter of March 6, 2001 is attached to this declaration as Exhibit "C."

9. About three years after sending the above-described letters, Sensitech filed the instant lawsuit against Time 'N Temperature without warning. Sensitech neither sent Time 'N Temperature a cease and desist letter nor in any other manner informed Time 'N Temperature of its belief that any of the company's products infringe any claim of any patent owned or licensed by Sensitech.

10. After Sensitech filed its suit for patent infringement, I retained, on behalf of Time 'N Temperature a patent attorney to evaluate Sensitech's allegations. I have been advised that neither the SmartChek nor the QC Max infringe any of the claims of U.S. Patents Nos. 5,313,848 and Re. 36,200, which were the two patents alleged to be infringed in Sensitech's complaint.

11. I am aware that Sensitech alleges that most temperature recorders are sold pursuant to direct arrangements with supermarket chains or receivers of perishable foods whereby the supermarket chains/receivers require that shippers use a particular company's recorders. I have been in the business of producing temperature recorders for use in monitoring perishable foods shipments for over 32 years. Based upon my experience in the industry, I can state that traditionally this was not the case. Prior to Sensitech's entry into the market, manufacturers of recorders sold their recorders directly to shippers at the point of origin of the shipment. In other words, at the farms where the perishable foods are grown. In the case of Time 'N Temperature, these sales took place and continue to take place in California. I estimate that about 80% of Time 'N Temperature's sales presently take place at the point of origin in California. With these point of origin sales in California, Time 'N Temperature does not know (other than generally that the foods are being shipped to other states) the end destination of any particular perishable foods shipment.

12. As I indicated above, Sensistech changed the fundamental manner in which recorders are sold by entering into direct arrangements or programs with supermarket chains, wherein the chains require that shippers only use Sensitech's recorders. Because Sensitech has established such programs throughout the United States, Time 'N Temperature has developed a competing program in response. Time 'N Temperature has experienced some success with its direct arrangement program.

4

13.  At present, Time 'N Temperature has no direct arrangements or accounts with any Massachusetts supermarket chain or other receiver of perishable foods, with the possible exception of Alphas Chelsea-MA. In particular, Time 'N Temperature does not have any ongoing relationships or accounts with the following Massachusetts companies: Big Y Food-MA, C&S Wholesale-MA, Community Suffolk-MA and Shaw's supermarkets, as alleged by Sensitech. The company does have a non-exclusive relationship with Alphas Chelsea, where about two years ago, Alphas Chelsea agreed to put Time 'N Temperature's recorders on its list of approved recorders which it will accept from shippers of perishable foods. Over the last two years, Time 'N Temperature has provided rebates to Alphas-Chelsea for an average of about eight (8) returned recorders per month or less than 100 recorders per year. These rebates are not paid on a regular monthly basis because Alphas-Chelsea does not return recorders to the company on a regular monthly basis. The recorders are returned on an irregular basis because Alphas-Chelsea does not require its shippers to exclusively use Time 'N Temperature's recorders—Time 'N Temperature's recorders are only one of the possible choices Alphas Chelsea's shippers may use. Because of this low level of volume and the irregular nature of the returned recorders, it is debatable as to whether the company's relationship with Alphas-Chelsea rises to the level of an "account." Over two years have passed since Time 'N Temperature last tried to market its products in Massachusetts. The company abandoned its previous attempt due to lack of success.

14.  I am informed and believe that Sensitech itself has direct arrangements with the aforementioned supermarket chains. In its marketing information, Sensitech claims that each of the above-mentioned companies is a participant in its "TempTale Monitor Program." True and correct copies of TempTale participant lists, as prepared by Sensitech, are attached to this declaration as Exhibits "D" and "E."

5

15. C&S Wholesale and Shaws, the two largest of the Massachusetts supermarket chains with which Sensitech alleges that Time 'N Temperature has a direct relationship long ago informed Time 'N Temperature that they would not use Time 'N Temperature's products, preferring instead to enter into direct arrangements with Sensitech.

16. Based upon my knowledge and over 32 years of experience in the industry, I estimate that from 1997 to-date, about 490,000 temperature recorders have been used on shipments of perishable foods destined for Massachusetts. I have reviewed the company's records and during this same time period, Time 'N Temperature has paid rebates on only 2300 recorders to Massachusetts companies or about 329 units per year out of a total market of about 70,000 units per year. In other words, less than ½ of 1% of the recorders used on Massachusetts bound perishable foods shipments have been Time 'N Temperature's recorders.

17. The approximately 329 recorders per year sold by Time 'N Temperature to shippers in California that happen to eventually arrive in Massachusetts, do so as the result of the following: Perishable foods shippers pick up their goods from California farms, wherein those goods must be shipped almost immediately due to their limited lifespan before spoilage. During the hectic peak shipping season, the Sensitech recorders typically requested by Massachusetts supermarket chains are not always available in which case the perishable foods shippers have no choice but to use whatever recorders are immediately available. Some of those immediately available recorders happen to be Time 'N Temperature's recorders.

18. As stated in my previous declaration, Time 'N Temperature directs no advertising specifically to Massachusetts via any advertising medium. Nor does Time 'N

Temperature presently have any employees, distributors, sales representatives or agents actively marketing its products in Massachusetts.

19. I have reviewed the company's records and have determined that Time 'N Temperature has provided Shaws with rebates on fewer than 700 recorders over the last 7 years.

20. Time 'N Temperature sells some of its recorders for $16.50/unit, rather than the $23.50/unit which is the industry standard price.

21. Traditionally, in this industry, temperature recorders are single use units and manufacturers of temperature recorders pay a rebate to anyone who returns a used recorder. All of Time 'N Temperature's recorders are single use units. Time 'N Temperature's recorders are not resold at their end destination. The company's recorders cannot be reused until such time as they are returned to the company for refurbishment. To comport with standard industry practice, Time 'N Temperature provides a pre-paid return mailing label with each recorder sold at the point of sale. Typically the point of sale is in California or other produce growing regions. Time 'N Temperature only provides pre-paid return boxes to supermarket chains/receiver's with which it has direct relationships. Pre-paid return boxes are intended to assist with the bulk return of recorders, i.e. about 20 per box. It is possible that the company may have provided such boxes to Alphas-Chelsea in Massachusetts, though not on a regular basis.

22. Time 'N Temperature pays rebates on any returned recorder. Therefore, the company does send rebate checks to Massachusetts upon occasion. However, because the company has no direct arrangements or accounts with any Massachusetts entity these rebate checks are not paid out on a regular monthly basis. For the reasons

explained above, approximately 329 of the company's recorders (out of the 70,000 recorders per year destined for Massachusetts) happen to end up in Massachusetts. Because of this, in any given year, the company sporadically pays rebates on these recorders as they trickle in.

23. It is Time 'N Temperature's policy to store customer information for two years on any returned recorder.

24. From time-to-time, Time 'N Temperature as part of its marketing efforts has offered computing equipment to supermarket chains in return for a reduced rebate on returned recorders until such time as the cost of such equipment was paid. One such computer was supplied to a supermarket in Massachusetts. However, that computer has since been returned and the relationship was terminated when the supermarket decided to use Sensitech's recorders.

25. As I have stated, Ms. Williams and I are the only management level employees at the company. The demands of this lawsuit are presently disrupting our ability to manage the company. I anticipate that if forced to defend this lawsuit in Massachusetts, the time required for travel for myself and Ms. Williams to participate in and monitor proceedings will severely disrupt our ability to manage the company. Simply put, it is extremely difficult to both defend against this lawsuit and manage the company at the same time. Being forced to defend in Massachusetts greatly compounds this problem. Time 'N Temperature has no offices or other facilities in Massachusetts and does not routinely send employees to Massachusetts or have any other contacts with Massachusetts whereby this burden could be lessened.

26.  In defending against this lawsuit, I anticipate that the company would rely upon at least the following witnesses:

Employee Witnesses

- Budd Pohle, inventor, resident of California;
- Janet Williams, inventor, resident of California;
- Phil Tripoli, sales representative, resident of North Carolina;

Third Party Witnesses

- Richard Spiedell, former sales manager, a resident of Montana;
- Mary Schilken, parts procurement, resident of California;
- Robert Schilken, design engineer, resident of California;
- Harold Meyers, website design and advertising, resident of California;
- Qeunt Osterlander, advertising; resident of California;
- Henry M. Bissell, Esq., patent attorney, resident of California;
- Derby Ashstone, design engineer, resident of California;
- Dan McGillicuty, temperature engineer, resident of California;
- Dean Hazard, Esq., outside corporate counsel, resident of California;
- Thomas Tignino, certified public accountant, resident of California;
- Brad Challberg, product development, resident of Taipei, Taiwan;
- William, product development, resident of Taipei, Taiwan;
- Ashley, product development, resident of Taipei, Taiwan; and
- Daniel, product development, resident of Taipei, Taiwan.

9

27. The cost of transporting each of the above-mentioned witnesses to Massachusetts for deposition or trial would impose a substantial financial burden on Time 'N Temperature.

28. I briefly reviewed the companies files and have determined that the company has thousands of documents related to the sales and engineering of our SmartChek and QC Max products. All of these documents are stored in California.

29. A true and correct copy of Sensitech's complaint in this case is attached hereto as Exhibit "F."

30. In view of what I am informed and believe to be malicious and anticompetitive actions perpetrated against Time 'N Temperature by Sensitech, I have caused Time 'N Temperature, via its retained attorneys, to file suit for violations of state and federal antitrust laws wherein Time 'N Temperature is seeking relief from Sensitech's actions. A true and correct copy of the complaint filed in the Central District of California is attached hereto as Exhibit "G."

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on September 9, 2004 in Ventura, California.

_____
Budd T. Pohle