19

1    one admitted relationship, but I thought you were telling
2    me that they admitted more than one, relationships
3    plural.
4        MR. GUTKOSKI:  They admit relationships with
5    unnamed supermarket chains.  You have to understand the
6    way the factual record before your Honor developed.
7    Sensitech was able through customers to identify these
8    letters, much as the one you went over with my opposing
9    counsel, that listed the supermarket chains that make
10   these available.  We made those allegations based -- the
11   allegations about these supermarket chains based upon
12   TNT's own documents.  TNT's response was to say, of those
13   five that you list, Big Y, Shaw's, C & S, Alphas Chelsea,
14   we admit that we had a relationship -- had relationships
15   regarding these infringing products over the last six
16   years such that at least 2300 monitors have worked, they
17   say indirectly, here to Massachusetts.  And they further
18   admit 700 of them went to Shaw's alone.
19       THE COURT:  Where is that?
20       MR. GUTKOSKI:  The 700 number, your Honor, is
21   -- it's in their reply brief at between pages 6 and 8,
22   your Honor.  I'm looking forward to Mr. Pohle's
23   declarations.  It's on page 7 in the reply brief.
24       MR. CISLO:  Paragraph 19.
25       MR. GUTKOSKI:  Paragraph 19, page 7, thank you,

20

1    of Mr. Pohle's affidavit, determined that 700 of those

2    recorders in the applicable period ended up at Shaw's.

3         THE COURT:  And is Shaw's exclusively in

4    Massachusetts?  Let me put it this way.  Well, actually,

5    I don't remember.  About 30 years ago, I represented

6    Shaw's on a matter.  I mean, Shaw's is not just in

7    Massachusetts.

8         MR. GUTKOSKI:  I don't know, your Honor.

9    However --

10        THE COURT:  I know.  I mean, I have to decide

11   based on the record, but I've been in a Shaw's in

12   Vermont.

13        MR. GUTKOSKI:  The representation they have

14   made, their admitted representation is 2300 units ended

15   up in Massachusetts, and 700 of those 2300 ended up at

16   Shaw's.  So, from their own admission, that 700 are

17   Massachusetts monitors that ended up in Massachusetts.

18   That's in addition, your Honor, to the previous admission

19   they made, which was of $9400 worth of direct sales not

20   through what they characterize as indirect sales through

21   growers here, but $9400 of direct sales to customers here

22   in Massachusetts.  Mr. Pohle in his declarations also

23   admits that.  So the question of personal jurisdiction --

24        THE COURT:  Actually, if the 9400 -- I thought

25   your best argument is for specific jurisdiction arising

```
                                                                  21
 1     out of the transaction of business in Massachusetts.
 2              MR. GUTKOSKI:   Yes.
 3              THE COURT:   And I haven't done it in this case,
 4     but I've done it in at least one other case many years
 5     ago, had to look at the personal jurisdiction issues that
 6     emerge from having a Web site, and they're complicated.
 7     But I thought your best shot was on specific
 8     jurisdiction, that they had this relationship with Alpha,
 9     at least.  And I actually thought that was enough to get
10     you personal jurisdiction, given the standard at the
11     outset of the case.
12              MR. GUTKOSKI:   We agree, your Honor.  And not
13     only is it those initial contacts when the monitors come
14     into the state, but you have to recognize the way these
15     things are operating.  You have to recognize the fact
16     that the supermarkets take them.  They use them.  They
17     download the information.  What's happened to this load
18     of squash or cabbage or what have you that's come into
19     Massachusetts, they then take and download that
20     information.  In many cases, TNT admits they send that
21     information to TNT, and TNT maintains it for those
22     Massachusetts customers for two years.  TNT allows the
23     software to read those monitors to be downloaded by its
24     Massachusetts supermarket customers here in the
25     Commonwealth.
```

22

1          The supermarket chains then take those monitors,
2     ship them back to TNT for a rebate.  TNT sends a check
3     from California back to the supermarkets here in
4     Massachusetts.
5          Each of those transactions involving each of one
6     of those monitors is a separate contact.  So it's not
7     just a one-time sale as in a retail operation where it
8     ends up somewhere, somebody goes into the store and buys
9     it.  We're talking about an ongoing relationship.
10         So, again, your Honor, for all of those reasons,
11    we believe it's specific jurisdiction because all these
12    contacts relate to the accused products, and there's been
13    no question that they do.  They are admitted that they
14    do.  And, therefore, we believe personal jurisdiction is
15    more than solid here.
16         Turning to the court's concern about venue, the
17    court has noted that the allegations about -- made by Mr.
18    Pohle regarding the negotiations back and forth between
19    Sensitech and TNT, correspondence, the allegations Mr.
20    Pohle makes about statements made by the CEO of Sensitech
21    go unaddressed.  They're unaddressed, your Honor, because
22    they are not relevant to the question of jurisdiction or
23    venue.  This is a patent case.  The defendants haven't
24    been answered yet.  We assume that they're going to
25    allege standard patent defenses of invalidity,

23

1   unenforceability, et cetera, as my brother counsel has
2   referenced here today.
3         The issue here, however, on the pleadings so far
4   before the court is infringement. The question of
5   infringement is going to turn on comparing the accused
6   devices, these temperature monitors of TNT, to the
7   patents and the related defenses to that.
8         As Mr. Cislo has pointed out, they raised
9   questions about asserting the reissue patents and not the
10  main patents, asserting how the reissue came about, what
11  was told to the Patent Office.  All of that information
12  is going to be testified to about by Massachusetts
13  witnesses.  All of the inventors, save one, are located
14  here in Massachusetts.
15        THE COURT:  What issues are there even going to
16  be testimony on?  In other words -- I don't have an
17  answer yet, but in terms of interpreting the patent, it's
18  only in rare cases that I would look at extrinsic
19  evidence.
20        MR. GUTKOSKI:  In which case we're talking
21  about lawyer arguments, and it's not a matter of whether
22  there are folks in California or folks in Massachusetts.
23        In terms of what was told to the Patent Office,
24  issues of unenforceability relate to the duty of candor
25  and whether or not the inventors and their prosecuting

```
                                                                      24
 1      attorneys divulged all the information that they were
 2      aware of to the Patent Office.  That's going to be
 3      involved, discovery and testimony from the prosecuting
 4      counsel here in Massachusetts, the inventors here in
 5      Massachusetts, except for one who's in Maine.  All of
 6      those witnesses, obviously, it's much more convenient for
 7      them to be involved in the litigation and to appear
 8      before the court here in Massachusetts than in
 9      California.
10            The only other potential defense relates to
11      invalidity and prior art and, for the most part, that's
12      either a comparison the court will do, perhaps with the
13      use of expert testimony.  Again, it doesn't have anything
14      to do with percipient witnesses or fact witnesses,
15      regardless of where they may be located.
16            In addition, your Honor, in terms of damages,
17      many of the questions of damages other than what the
18      sales have been for by TNT, which are primarily a
19      documentary exercise, relate to Sensitech's operations.
20      If it's a question of lost profits, their capacity to
21      have sold that, to have made those products that
22      otherwise TNT sold, their ability to market those
23      products, all that relates to Sensitech's information,
24      the plaintiff's information.  The people that will
25      testify about that are located in Beverly, Massachusetts.
```

25

1          So the question of --
2          THE COURT:  They work for Sensitech.  In other
3     words, if the case was in California and it was
4     necessary, Sensitech could take them to California.
5          MR. GUTKOSKI:  The management people do on the
6     damages question, yes, your Honor.  Not all the inventors
7     do.  In fact, Mr. Berrian himself, a co-plaintiff here,
8     over which, by the way, there would be no personal
9     jurisdiction over him in California, and that's why they
10    have been unable to in their retaliatory suit alleging
11    these patent issues as declaratory judgment actions, but
12    well after our patent complaint was filed, they were
13    unable to assert jurisdiction over Mr. Berrian.  However,
14    he is not an employee of Sensitech.  And, in fact --
15         THE COURT:  That's an interesting question.  Can
16    the case with -- can his case be transferred to
17    California?
18         MR. GUTKOSKI:  Can it?  Yes.  Should it?  No.
19         THE COURT:  I appreciate you're telling me it
20    can.  I've been dealing with some other things too.
21         MR. GUTKOSKI:  If Mr. Berrian was the sole
22    owner of the patents, and he found out that TNT was
23    infringing his patents, and TNT had no contacts with his
24    home forum of Massachusetts, then he would most likely
25    have to go to a place where he had jurisdiction over TNT

26

1  in order to sue them.  However, the burdens, given that
2  he has availed himself of his home forum, as has
3  Sensitech, given that he has chosen to sue in the place
4  where he has suffered injury here in Massachusetts, as
5  has Sensitech, the question of transferring his case as
6  an individual, and the burden is on him as an individual
7  versus a company, are obviously much different.
8          THE COURT:  I don't know that this is addressed
9  in the papers.  You're representing both plaintiffs,
10 correct?
11         MR. GUTKOSKI:  Correct.
12         THE COURT:  Do the papers tell me who's paying
13 you?
14         MR. GUTKOSKI:  No.  That being said, your
15 Honor, the availability of counsel is, as your Honor
16 knows, not the only question that needs to be asked in
17 terms of relative burdens on the parties.  It is, as was
18 noted in my brother'ss argument, your Honor, I believe
19 noted by the court, the relative burdens in convenience
20 when you've got basically one party on each side or, in
21 this case, two versus one, two in Massachusetts, one in
22 California, are pretty much going to wash.
23         THE COURT:  Let me ask you this, though.  Do the
24 papers tell me your relative share of the market,
25 Sensitech's relative share of the market?

27

```
 1              MR. GUTKOSKI:  No, they do not.
 2              THE COURT:  I thought they were claiming it was
 3     about 90 percent, and they were your only competitor
 4     still doing business.
 5              MR. GUTKOSKI:  I believe I heard those
 6     representations today.  That's not true.  Those are not
 7     made in the papers.  And, therefore, they, one, can't be
 8     taken as true and unrebutted for purposes of deciding
 9     this motion; and, two, I will represent to the court that
10     we don't have 90 percent of the market, and the
11     representations about our acquiring other competitors
12     while Sensitech has acquired some of the competitors, the
13     allegations, without foundation as to Sensitech's intent
14     behind them or whether or not any of that alleged intent
15     in any way informs their decision to bring again this
16     garden variety against patent case against TNT, are
17     completely untrue.
18              So, your Honor, the decision that you can make
19     on the record before you regarding venue comes down to,
20     as your Honor pointed out, were the people that are most
21     important to the court to hear these matters.  And,
22     again, whether we look at the question of infringement,
23     which is our allegation, or their likely defenses to come
24     out in their answer, those witnesses are located here.
25              THE COURT:  What are the likely defenses?
```

28

```
 1              MR. GUTKOSKI:  That the patent is invalid,
 2    again, requiring expert testimony, not percipient
 3    witnesses, an analysis of prior art, and the patent is
 4    unenforceable.  What we heard about the reissue patent,
 5    what we heard about what was and wasn't told to the
 6    Patent Office, what was alluded to by Mr. Cislo regarding
 7    Sensitech's motives and allegations in bringing this
 8    complaint, all of that is going to turn on the testimony
 9    of Sensitech's witnesses and people located here in
10    Massachusetts, not those in California.
11              THE COURT:  Thank you.
12              Mr. Cislo, do you want to respond briefly?
13              MR. CISLO:  Yes, if I may, your Honor.
14              A couple of things.  One is that I believe in
15    the verified complaint that's attached to the second Budd
16    Pohle declaration  --
17              THE COURT:  Hold on a second.  The second one?
18              MR. CISLO:  Yes.
19              THE COURT:  What exhibit number, letter?
20              MR. CISLO:  F.
21              THE COURT:  Go ahead.
22              MR. CISLO:  I think on page 10, paragraph 23 in
23    its verified complaint, the allegation of the antitrust
24    claim is 85 to 90 percent of the sub-market for
25    electronic data loggers is what Sensitech controls, just
```

                                                                29

1   to dispose of that point.
2           The other thing that I'd like to point out is
3   that the declaration that was addressed in Budd Pohle at
4   paragraphs 13 and 19 where it was talking about this
5   relationship with Alphas Chelsea, in each case, it's
6   talking about basically sending a rebate check to these
7   folks in Massachusetts for returning a piece of
8   equipment.  In other words, there is no sale of product.
9   You might -- we may call it a relationship, but it's
10  really simply sending a check to somebody for returning a
11  piece of equipment, which is not an infringing action.
12          The other bigger point that I'd like to make is
13  that defendants have pointed out and speculated as to
14  what all these defenses might be.  Right now, it's before
15  the court as only one issue, and that is the allegation
16  of infringement.  There has been no answer yet.  And
17  that's the legal issue to be looked at, because
18  everything else would be speculation about fraud in the
19  Patent Office.
20          THE COURT:  Well, with regard to infringement,
21  why would the third party witnesses you were telling me
22  about have admissible testimony?
23          MR. CISLO:  Because in every single case, the
24  third party witnesses, all located in California, will
25  testify how they constructed, how the device functions,

```
                                                                    30
 1      what electronic componentry, that all has to do with the
 2      issue of infringement.  The court can't determine what
 3      the meet and bounds of the patent are.  They don't need
 4      all this testimony.  The inventor is superfluous.  We do
 5      know that Sensitech is exclusive (unintelligible).  That
 6      inventor is not even relevant to these proceedings
 7      because he doesn't have any rights, in this case a
 8      royalty.  But, for the most part, Sensitech is driving
 9      the vote on this.  So it's all about the infringement
10      issue.  And once the court looks at the patent and
11      construes it from file history, nothing else is really
12      relevant because it's all intrinsic.  But what is
13      relevant is the issue of infringement.  What is this
14      component, how is it made, how is it assembled, how is it
15      used?  So --
16              THE COURT:  Okay.  Thank you.
17              MR. GUTKOSKI:  If I could just address that one
18      point briefly, your Honor.
19              Determining infringement involves comparisons
20      between what the product is and the patent, how it was
21      built, why it was built.  How TNT's people believed it
22      works or represented that it works is secondary, if not
23      irrelevant.  It is actual comparison.
24              THE COURT:  Let me ask you this question.  It's
25      by no means a rhetorical question.
```

1       I rarely if ever hear extrinsic evidence in
2  connection with a Markman hearing that's usually
3  conducted in conjunction with a motion for summary
4  judgment because I'm focusing on the intrinsic evidence.
5  Unless the Federal Circuit has changed its mind recently,
6  that's what I understand I'm supposed to do.  But I'm
7  never sure that there isn't something recent I'm not up
8  on.
9       How do I know without getting testimony, though,
10 what the defendant's product is for the purpose of
11 comparison?  Is their product patented?
12      MR. GUTKOSKI:  No, your Honor.  For the purpose
13 of the Markman hearing, you are correct, you're supposed
14 to look at the intrinsic evidence, the prosecution
15 history.  So in terms -- all I was going to say was their
16 product is irrelevant to the purposes of Markman.  Once
17 we have the patent construed, we proceed to summary
18 judgment or trial and the purposes of infringement.  Then
19 you look at the product itself and expert testimony about
20 -- this is an electronics product.  The patent claims
21 involved here relate to the layout of electronic
22 components and what does what and what connects to which
23 memory and what have you.  So that's going to be the
24 subject of expert testimony.
25      THE COURT:  For their product.

32

```
 1              MR. GUTKOSKI:  Correct, for their product.
 2              THE COURT:  Why does it have to be expert
 3      testimony?  It could be the people who built it.  It
 4      doesn't have to be some third party.
 5              MR. GUTKOSKI:  I think there's extensive law
 6      out there, your Honor, that says that the
 7      characterizations of the accused infringer about the
 8      product are not the primary concern.  In fact, what the
 9      court needs to be looking at is what the product actually
10      does.  And that's the subject of expert testimony.  In
11      fact, to the extent that your Honor is concerned at
12      Markman about not involving experts, only looking at
13      intrinsic testimony, the only place in the trial for the
14      much ballyhooed patent law expert or patent trial expert
15      is on the question of infringement and comparing the
16      accused device to the patent claims.
17              The only other point I would make, your Honor,
18      is Mr. Cislo just mentioned that the inventor is
19      irrelevant.  The inventor's testimony in terms of Markman
20      in terms of what he believes the patent claims to be,
21      correct, are not relevant.  It's your own Honor's
22      construction.  However, in terms of what their defense
23      is, what Mr. Cislo told us their defenses are about
24      whether or not this patent is unenforceable or not is
25      going to turn on what Mr. Berrian and his fellow
```