UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SENSITECH INC. and DONALD W.
BERRIAN,

     Plaintiffs,

v.

TIME & TEMPERATURE COMPANY
d/b/a TIME 'N TEMPERATURE
CORPORATION

     Defendant.

Case No. 04-11483 (MLW)

ORAL ARGUMENT REQUESTED

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TO TRANSFER VENUE

Painting an incomplete, and inaccurate, landscape of its jurisdictional ties to

Massachusetts, Defendant Time & Temperature Company's ("TnT") motion relies on TnT's lack

of physical presence in the Commonwealth. TnT fails to mention either its direct contacts with

several Massachusetts users of its accused electronic temperature monitors, or its indirect

contacts with Massachusetts through the stream of commerce it created to bring its accused

monitors into the Commonwealth. Plaintiffs Sensitech, Inc. ("Sensitech") and Donald W.

Berrian ("Berrian") oppose TnT's motion to dismiss or transfer because these key facts show that

exercising personal jurisdiction over TnT in this patent case is proper under both Federal Circuit

precedent and Constitutional due process.

Venue also is proper in this District, because TnT is subject to personal jurisdiction here.

Moreover, this case should remain here in the plaintiffs' chosen forum rather than be transferred

to the Central District of California, because TnT has failed to meet its burden to identify

71245403_1.DOC

specific facts establishing that transfer would promote the convenience of all parties or the interests of justice. Rather, TnT merely contends that transfer would be more convenient for TnT – a proposition that is true virtually any time a defendant is sued outside of its home state, but which legally cannot support transferring this case.

In the event the Court has any concern that the facts presented by plaintiffs are insufficient to confer jurisdiction and venue, plaintiffs request limited discovery from TnT on its activities within the Commonwealth.

## FACTUAL BACKGROUND

Sensitech, headquartered in Beverly, Massachusetts, manufactures temperature monitors used in shipping perishable goods. (Cmplt. ¶ 1, DiRubio Decl. ¶ 5.) Co-plaintiff, Donald Berrian, is one of the inventors of United States Patent No. 36,200 (the "'200 Patent") entitled "Disposable Electronic Monitor Device," and the assignee of that patent. Sensitech, the exclusive licensee of the '200 Patent, makes and sells electronic temperature monitors including those under the name TempTale®. (Cmplt. ¶ 9; DiRubio Decl. ¶ 5.) Defendant TnT also makes, and sells worldwide, electronic temperature monitors under at least the names SmartChek and QC Max. (DiRubio Decl. ¶ 6.) Plaintiffs believe that TnT's SmartChek and QC Max monitors infringe the '200 Patent. (See Cmplt. ¶ 10.) Plaintiffs notified TnT in 2001 of the '200 Patent and its availability for license, but TnT did not substantively respond.[1]

---

[1] In an apparent attempt to distract from the jurisdictional allegations raised by its motion, TnT includes a diatribe about a purported "vendetta," claiming that Sensitech has filed this lawsuit in an effort to drive TnT out of business. (See TnT Memo. at 1-2.) These untrue allegations are wholly irrelevant to this motion. More importantly, TnT omits any assertion that its accused products are not used in Massachusetts, that the accused products do not infringe plaintiffs' patent, or that TnT ever told Sensitech in their previous correspondence and negotiations that TnT's products were not infringing.

## I.    TnT's Activities Directed Toward Massachusetts

Although not disclosed by TnT, the market for electronic temperature monitors is not directed to selling monitors to growers of produce in states like California. (See DiRubio Decl. ¶¶ 8-9.) Rather, the market generally is directed to the *purchasers* of perishable goods, including grocers and supermarkets across the country, including in Massachusetts.[2] As a result, TnT has purposefully directed its accused temperature monitors to be used regularly on perishable shipments through, and terminating at stores and warehouses in, Massachusetts. (Id. ¶¶ 17-20.)

Perishable goods can be damaged if they are exposed to temperatures too high or too low during shipment. (DiRubio Decl. ¶ 7.) Temperature monitors are used inside trucks carrying perishable goods from a supplier, such as a grower of fresh produce (often called a "grower/shipper"), to a purchaser, such as a grocery store chain (often called a "receiver"), to detect and report temperatures experienced during shipment. (Id. ¶ 8.) On each truck's arrival at the receiver's warehouse, a receiver will check the temperature monitor in deciding whether to accept or reject the shipment of perishable goods. (Id. ¶ 10.) To do so, the receiver uses computers and software provided by the monitor's manufacturer, such as TnT. (Vaught Decl. Ex. B.) Thus, the data recorded by the monitor is used by the receiver at the place of receipt. (DiRubio Decl. ¶ 10.) Most receivers then send used monitors back to the manufacturer for recycling in order to receive rebates from the manufacturer for each returned unit. (Id.)

To obtain these recycling rebates, as well as to ensure they have the appropriate computing equipment to read the monitors, receiving stores frequently require grower/shippers to use monitors from specified companies such as TnT on shipments destined for their warehouses.

---

[2] The realities of the monitor market are evidenced by TnT's sales statements on its own website – "We can assist you to . . . [m]onitor your *incoming* temperature sensitive shipments to assure quality." (DiRubio Decl., Ex.A (emphasis added).)

(DiRubio Decl. ¶¶ 8-9.) Receivers then reimburse the grower/shippers for the cost of each temperature monitor. (Id.; see also In Re Susan Lorie Tylock, 2001-1 Sales and Use Tax Mem. Op. (Cal. State Board of Equalization Feb. 25, 1999) (copy attached).)

TnT has made direct arrangements with receivers of perishable goods whereby the receivers request that grower/shippers use TnT's monitors on shipments. (DiRubio Decl. ¶ 15; Vaught Decl. ¶ 5, Ex. A.) TnT has entered a number of such programs with receivers across the country, including in Massachusetts, as evidenced by a list of its receivers TnT faxed to grower/shippers on March 22, 2002. (Vaught Decl. ¶¶ 5-6, Ex. A.) The fax read "Check this list for your customers who request SmartChek digital recorders. Call 800-338-7295 to order." (Id.) This list shows five receivers in Massachusetts that requested TnT's digital recorders on their shipments: Alphas Chelsea-MA, Big Y Foods-MA, C&S Wholesale-MA, Community Suffolk-MA, and Shaw's Supermarkets. (Id.)[3]

The two largest companies of those five Massachusetts TnT accounts are Shaw's Supermarkets and C&S Wholesale. (DiRubio Decl. ¶ 18.) Shaw's Supermarkets is a large New England-based grocery store chain headquartered in Bridgewater, Massachusetts. (Id., Ex.C.) At all relevant times, Shaw's has had a cold storage distribution center in Methuen, Massachusetts. (Id.) C&S Wholesale is a large grocery distributor based in New England, which at all relevant times operated three Massachusetts facilities (North Hatfield, South Hatfield, and Westfield). (Id. ¶ 9, Ex. D.) In an April 4, 2002 letter, TnT's Sales Manager Phil Tripoli identified C&S Wholesale and Shaw's as among TnT's accounts: "Smartchek recorders are the preferred provider by NAPAR and FMI plus other participants in the program include A&P, Fleming

___
[3] Other stores on this list also operate receiving locations in Massachusetts, such as Price Chopper, which has at least 12 stores in the Worcester area as well as stores in New York, Vermont, Connecticut, and Pennsylvania. (See DiRubio Decl. ¶ 17, Ex. B.)

Companies, Roundy's, *C&S Wholesale, Shaw's*, Price Chopper, Tom Lange, Food Lion, and many more." (Vaught Decl. ¶ 7, Ex. B at 2 (emphasis added).)[4]

The volume of TnT's unit and dollar sales attributable to perishable goods shipments destined for Massachusetts pursuant to programs with receivers appears substantial. For example, based upon his experience and knowledge of the monitor industry, Stephen DiRubio Vice-President and General Manager of Sensitech's Food Division estimates that TnT sold at least 1000, and perhaps as many as 1500, monitors per year under the Shaw's program. (DiRubio Decl. ¶ 20.) At $23.50 per unit (see proposal attached to Vaught Decl., Ex. C), this would yield gross revenue between $23,500 and $35,250 per year for the Shaw's account alone.

In operating the programs listed above, TnT would have had direct contacts with the Massachusetts accounts, such as telephone calls, emails, letters, and/or in-person sales visits. Sample correspondence from TnT to retail and wholesale accounts outside of Massachusetts shows that TnT's Sales Manager, Phil Tripoli, communicated directly with TnT's accounts by telephone, letter, and in-person meetings. (Vaught Decl., Exs. B and C.) Further, sample correspondence between TnT and a wholesale account included a "SmartChek Proposal" showing that TnT sought to have written documentation signed by both TnT and the receiver outlining the terms of its program. (Id., Ex. C (last page).) There is no reason to believe TnT employed different practices with its Massachusetts accounts. (Id., ¶ 11.)

TnT also likely sent equipment into Massachusetts when it implemented its temperature monitor programs, by providing each receiver with computing equipment enabling its staff to read TnT monitors in their warehouses. In an April 4, 2002 letter from TnT to one of its

---

[4] Note that the copy of this letter attached to the Declaration of David Vaught was forwarded to Sensitech's Calgary, Canada sales office from the recipient with all references to its name redacted, apparently because this contained information regarding a competitor of Sensitech. (Vaught Decl. ¶ 10.) Sensitech does not have an unredacted copy of this letter. (Id.)

accounts, TnT offered to provide "2 computers, monitors and printers with this program," for use by the receiver, as well as TnT's SmartChek software and cables. (Vaught Decl., Ex. B at 1-2.)

In addition, TnT likely sent monthly rebate checks to those accounts in Massachusetts, particularly the larger accounts such as Shaw's, which has its headquarters in Massachusetts. (Id. ("Rebates are paid on time each month with a comprehensive report.").) TnT also likely assisted those receivers in returning used monitors to TnT, by sending pre-paid return boxes to the receivers' Massachusetts warehouses so the receivers could send the used monitors back to TnT. (Id. ("Prepaid return cartons are provided on a regular basis," for the receiver's "convenience").) Finally, TnT likely continues to maintain information for its Massachusetts accounts given that TnT offered to store customers' data "for a period of two years." (Id., Ex. C at 1.)

TnT has disclosed none of these activities and contacts with Massachusetts to the Court. To the extent TnT disputes these contacts, Sensitech requests discovery on TnT's contacts with the forum, including its activities with receiver accounts located here.

## II.  TnT's Additional Contacts With Massachusetts

Beyond operating its temperature monitoring programs utilizing the accused devices here in Massachusetts, TnT admits having additional contacts within the forum. As set forth in TnT's Memorandum and the Declaration of Budd Pohle, TnT's other contacts with Massachusetts include attending a trade show in Boston on two occasions; letters from TnT and its counsel to Sensitech in Beverly; and direct sales to forum customers in the amount of $9,400.

TnT also operates an Internet website that provides detailed production information and offers downloads of software to be used with TnT's SmartChek and QCMax monitors. (DiRubio Decl. ¶ 23, Ex. H.) TnT uses international distributors in many different countries. (Id. ¶ 22, Ex. F.) TnT advertises on the Internet, including an on-line industry advertisement stating that "T 'N

-6-

T products are distributed worldwide so contact us for agents in your area" and "we are always interested in developing new markets and distributors inquiries are welcome." (DiRubio Decl. ¶ 22, Ex. G.) TnT also advertises in national trade magazines, leading to at least some of its direct sales to Massachusetts companies. (Pohle Decl. ¶ 30.)

## BURDEN OF PROOF AND APPLICABLE FEDERAL CIRCUIT LAW

To defeat a motion to dismiss for lack of personal jurisdiction, plaintiffs must satisfy only a prima facie standard of proof, under which the district court is to "consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992). The district court does not act as a factfinder, but instead adduces "the facts from the pleadings and the parties' supplementary filings, including affidavits, taking facts affirmatively alleged by the plaintiff as true and construing disputed facts in the light most hospitable to plaintiff." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994). Where the plaintiff's factual allegations "are not directly controverted, [they] are taken as true for purposes of determining jurisdiction." See, e.g., Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1563 (Fed. Cir. 1994).

Federal Circuit law governs motions to dismiss patent infringement lawsuits for lack of personal jurisdiction. See, e.g., Beverly Hills, 21 F.3d at 1564.[5] The Federal Circuit employs a three-part test to determine whether the exercise of personal jurisdiction satisfies the Constitution: "To determine whether jurisdiction over an out-of-state defendant comports with

---

[5] As noted by TnT, the Federal Circuit defers to local interpretations of the applicable state's long-arm statute. The Massachusetts long-arm statute has been interpreted to reach to the full extent allowed by the United States Constitution, such that the Court may turn directly to the constitutional analysis. See, e.g., Richard A. Daynard v. Ness, 290 F.3d 42, 52 (1st Cir. 2002); Tatro v. Manor Care, Inc., 416 Mass. 763 (1994); see also Akro Corp. v. Luker, 45 F.3d 1541, 1544 (Fed. Cir. 1995) (due process analysis was "sole inquiry" because long-arm statute extended to outer limits of due process).

due process, we look to whether (1) the defendant purposefully directed its activities at residents

of the forum state, (2) the claim arises out of or relates to the defendant's activities with the

forum state, and (3) assertion of personal jurisdiction is reasonable and fair." Electronics for

Imaging, Inc. v. Coyle, 340 F.3d 1344, 1350 (Fed. Cir. 2003).[6]

For the reasons that follow, the exercise of personal jurisdiction over TnT in this case

satisfies all three elements of this test.

## ARGUMENT

## I.      TnT Is Subject To Personal Jurisdiction In Massachusetts
##         For Plaintiffs' Patent Infringement Claims.

TnT deceptively recites a litany of things it does not do in Massachusetts, including

maintain offices, assets, or sales agents in the Commonwealth. (TnT Mem. at 6-8.) It is plain,

however, that such activities are *not* necessary to subject an out-of-state defendant to personal

jurisdiction. Rather, purposeful activities satisfying Due Process include not only *direct* sales of

infringing goods to customers in the state, but also *indirect* shipments of infringing goods

reaching the forum through an established distribution channel. Here, TnT has directly[7] and

indirectly subjected itself to personal jurisdiction in this District.

---

[6] The Federal Circuit applies this standard to determine if specific jurisdiction exists over a defendant. Electronics for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1350 (Fed. Cir. 2003). In the case at bar, TnT's continuous and systematic contacts with Massachusetts arguably support general jurisdiction, in which the cause of action need not be related to the forum contacts. It is unnecessary to decide whether general jurisdiction exists, however, because TnT's forum contacts, in particular its rebate programs with companies either based in or having distribution centers in Massachusetts, involve the products accused of patent infringement.

[7] TnT admits that it has sold unspecified products to residents of Massachusetts. (TnT Mem. at 8.) Presumably, if these were limited to non-accused stripchart recorders, TnT would have said so, as it did with the products exhibited at the Boston trade show TnT attended in 1995 and 1996. (Compare Pohle Decl. ¶ 32 (describing trade show) with Pohle Decl. ¶ 33 (describing $9,400 in sales of products of all types to residents of Massachusetts.) A single direct sale of an infringing good in the forum state can establish jurisdiction. See, e.g., Maxwell Chase Techs. L.L.C. v. KMB Produce, Inc., 79 F. Supp.2d 1364, 1372-73 (N.D. Ga. 1999) (holding single sale of 100 units of accused product for $275.00, together

## A.    TnT Has Purposely Directed Its Accused Products Into Massachusetts Through Its Monitor Programs With Companies Here.

1.    TnT's Direct Contacts Establish Jurisdiction.

Constitutionally sufficient minimum contacts with Massachusetts exist because TnT has purposely created and operated monitor programs with multiple end-users in Massachusetts. Through these programs, TnT directed the Massachusetts receivers to require TnT monitors on their shipments. TnT provided the Massachusetts receivers with software and equipment to use the monitors in Massachusetts and download their data at Massachusetts facilities. TnT also arranged for the receivers to return used monitors from Massachusetts to TnT, and then sent rebates to Massachusetts receivers on a regular basis. Through these repeated and systematic direct contacts, TnT has purposefully availed itself of the benefits of doing business in Massachusetts, and in so doing subjected itself to the jurisdiction of the courts within the Commonwealth. See Deprenyl Animal Health, Inc. v. University of Toronto Innovations Found., 297 F.3d 1343, 1351-52 (Fed. Cir. 2002) (purposefully directed activities sufficient).

Two of TnT's own documents evidence its monitor rebate programs with multiple companies located in Massachusetts. (Vaught Decl., Exs. B and C.) These documents show TnT knew and intended that its monitors would be sent by shippers to these accounts in Massachusetts and be used to download temperature information from the monitors to computers located in the Commonwealth. (See Vaught Decl., Exs. A-C.) They further show TnT's direct contacts with such Massachusetts receivers in implementing the rebate programs, providing technical equipment, and sending monthly rebate checks directly to receivers. (Id.) [8] These

---

with promotional letter soliciting further sales, would be enough to meet minimum contacts) (citing Osteotech, Inc. v. GenSci Regeneration Sciences, Inc., 6 F. Supp.2d 349, 354 (D.N.J. 1998).)

[8] In addition to providing detailed product information, TnT's website also enables users of its monitors in Massachusetts and elsewhere, to download TnT's software for the SmartChek and QC Max

programs demonstrate TnT purposely directed its activities toward Massachusetts such that TnT should reasonably have anticipated being sued here, and establish the required minimum contacts.

### 2. TnT's Indirect Contacts Establish Jurisdiction.

TnT's systematic activities of placing its accused products into the "stream of commerce" through an established distribution channel ending, in part, in Massachusetts constitute indirect contracts, which also subject TnT to personal jurisdiction in the Commonwealth. See The Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558 (Fed. Cir. 1994) (reversing dismissal of a patent infringement case for lack of personal jurisdiction over the defendants). In Beverly Hills, plaintiffs sued a Chinese manufacturer and New Jersey importer of allegedly infringing ceiling fans in Virginia despite the fact that their only contacts with the forum state resulted from indirect shipments of accused products through a stream of commerce. Id. at 18-19. Defendants argued they lacked sufficient ties to Virginia, citing their absence of assets, employees, agents for service of process, licenses to do business, or direct shipments or sales of accused products to Virginia, and noted that only 52 of the accused fans were available for sale in the state. Id. at 1565. Nonetheless, the Federal Circuit found that jurisdiction existed under the "stream of commerce" theory because defendants "purposefully shipped the accused fan into Virginia through an established distribution channel. The cause of action for patent infringement is alleged to arise out of these activities. No more is usually required to establish specific jurisdiction." Beverly Hills, 21 F.3d at 1565 (citations omitted).

---

monitors. (DiRubio Decl., Ex. A at 3.) Providing such ability to download software is relevant to the jurisdictional analysis, because there are no limitations on the state in which such downloads take place. See Padcom v. Netmotion Wireless, 2004 WL 1192641 at *4-6 (D. Del. May 24, 2004) (national interactive website providing ability to download software, together with other marketing efforts directed toward Delaware, supported personal jurisdiction over Washington state defendant).

[D]efendants, acting in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there.

Id. at 1566.

Like the out-of-state defendants in Beverly Hills, TnT acted purposefully to create a distribution channel that would bring its temperature monitors into Massachusetts, where they are used by receivers of perishable goods. As explained above, through direct contacts with Massachusetts receivers, TnT created rebate programs with the receivers requiring shippers to use TnT's accused SmartChek electronic monitors on shipments to such receivers in Massachusetts. (Vaught Decl., Ex. A.) TnT then sold the accused monitors to grower/shippers, who placed them on shipments destined for Massachusetts receivers. Therefore, TnT knew its accused products would be shipped into Massachusetts, because TnT created a distribution channel to end up here.

It is irrelevant to the stream of commerce analysis that TnT does not itself sell or ship the majority of its monitors directly into Massachusetts. It is also irrelevant that TnT's monitors are used, but not resold, within the forum state. For example, in Sonoco Products Co. v. Inteplast Corp., the court found jurisdiction in South Carolina even though the foreign defendant manufacturer did not itself sell or ship the accused products into South Carolina, and the bags were used and not resold there. 867 F. Supp. 352 (D.S.C. 1994). Through distributors in several states, not including South Carolina, the defendant sold plastic bags to grocery store chains, knowing that many of them would in turn distribute the bags for use at their various stores in different states. Id. at 354.[9] The court also expressly rejected the defendant's attempt to

---

[9] Defendant's bags were shipped to 8 customers located in North Carolina, two of which operated stores in South Carolina where the allegedly infringing bags were found. Id.

distinguish Beverly Hills on the grounds that the fans there were resold within the state, while the plastic bags in Sonoco were used, but not resold, in South Carolina, because use of a patented invention is a form of infringement. "This distinction is not significant. The Patent Act provides that 'whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent thereof, infringes the patent.' 35 U.S.C. § 271(a)." Sonoco, 867 F. Supp. at 356. By creating a distribution system that resulted in use of the accused bags in South Carolina, the defendant contributed to infringement taking place in that state and could be held accountable there. Id.

Like the bag manufacturer in Sonoco, TnT has created a nationwide distribution system for its monitors including sales agents in various locations and shipments to receivers across the country, including Massachusetts. This system results in TnT monitors being sent to Massachusetts on trucks where they are used not only to track temperatures on Massachusetts roadways, but also to report that temperature information to the receivers in Massachusetts. These actions are infringing activities, and subject TnT to jurisdiction here to be held accountable for them. See also Maxwell Chase Tech. v. KMB Produce, Inc., 79 F. Supp.2d 1364 (N.D. Ga. 1999) (finding jurisdiction over Alabama manufacturer that sold the absorbent tomato containers to a produce supplier in Texas and Louisiana knowing the supplier would use them to sell diced tomatoes to restaurants throughout the South East, including Georgia); Motorola, Inc. v. PC-Tel, Inc., 58 F. Supp.2d 349, 355 (D. Del. 1999) (integration of accused softmodem into computer systems distributed to national retailers supported jurisdiction over California manufacturer who had no direct contacts with state, but acted in "consort" with licensees to place softmodems in stream of commerce.

**B.    Plaintiffs' Patent Infringement Claims Arise Out Of Or Relate To TnT's Contacts With Massachusetts.**

The above proffered evidence supports a finding that TnT has had direct and indirect contacts with Massachusetts through its programs involving at least TnT's SmartChek monitor line. Such contacts include actively inducing TnT's Massachusetts accounts to request TnT's monitors on their shipments destined for Massachusetts, establishing a distribution chain with grocers/shippers to include TnT's monitors in those shipments, facilitating receivers' use of those monitors upon their arrival in Massachusetts, and paying rebates to Massachusetts receivers for their use. Because plaintiffs accuse at least these SmartChek products of infringing the '200 Patent, their claims relate to TnT's contacts with Massachusetts, satisfying the Federal Circuit's second prong.  See Beverly Hills, 21 F.3d at 1565.

**C.    The Exercise Of Personal Jurisdiction Over TnT Is Reasonable And Fair.**

Once plaintiff shows sufficient minimum contacts to satisfy due process, "it becomes defendants' burden to present a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Electronics for Imaging, 340 F.3d at 1351-52 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). Such compelling cases are generally limited "to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." Beverly Hills, 21 F.3d at 1568. TnT has failed to present such specific considerations, instead citing only general factors existing in any lawsuit between parties from distant fora, which have failed to defeat jurisdiction in other patent infringement cases. (See TnT Mem., at 12-13.)

Sensitech and Berrian are both Massachusetts citizens, and, as such, have significant interests in litigating here in their chosen forum. Massachusetts also has a significant interest in

-13-

adjudicating this dispute because the harm from TnT's infringement has been felt in Massachusetts at Sensitech's headquarters and Berrian's residence, and Massachusetts has an interest in discouraging injuries occurring within its borders. See Beverly Hills, 21 F.3d at 1568 (exercise of jurisdiction in the Eastern District of Virginia was reasonable even though plaintiff was incorporated in Delaware and had its principal place of business in California); Sonoco, 867 F. Supp. at 356 (noting that South Carolina's ties were even stronger than those in Beverly Hills because the plaintiff's headquarters and principal place of business were in the forum state).

Any burden on TnT in litigating in Massachusetts does not outweigh the interests of plaintiffs and the Commonwealth. Burdens of travel and the like attending distant litigation are usually insufficient to offend due process, because "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." Beverly Hills, 21 F.3d at 1569 (personal jurisdiction in the Eastern District of Virginia was proper despite fact defendant would have to travel from China) (quoting World-Wide Volkswagen v. Woodson, 444 U.S. 286, 294 (1980)); see Motorola, 58 F. Supp.2d at 356 (burden on Washington state defendant to litigate in Delaware was less than that on Chinese defendant in Beverly Hills and alleviated by "enhanced communication capabilities, such as audio and video teleconferencing"). TnT has a national, indeed, international sales force and its president admittedly has traveled to Massachusetts on TnT business. (Pohle Decl. ¶ 32.) Given the modern communication, the widespread nature of TnT's business, the fact that TnT has retained Massachusetts counsel for this case, and all of TnT's purposeful contacts with the forum, the exercise of jurisdiction over TnT in Massachusetts is both reasonable and fair.

## II.    Venue Is Proper In The District Of Massachusetts.

Venue in a patent infringement case is proper where the defendant is subject to personal jurisdiction. 28 U.S.C. §§ 1391(c), 1400(b). Because TnT is subject to personal jurisdiction in the District of Massachusetts, venue is proper in this District.

## III.    The Court Should Deny TnT's Motion To Transfer This Case To The Central District Of California.

TnT alternatively moves pursuant to 28 U.S.C. § 1404(a) to transfer this case to the Central District of California, where TnT maintains its headquarters. The discretionary decision to transfer venue for the convenience of parties and witnesses is guided by well-settled principles. As an initial matter, the burden of proof lies with the party seeking transfer, in this case TnT, to overcome the strong presumption favoring the plaintiff's choice of forum. Nowak v. Tak How Invs, Ltd., 94 F.3d 708, 719 (1st Cir. 1996) ("the defendant must bear the burden of proving . . . that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum"); Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir. 2000) (same)). This presumption favoring the plaintiff's choice of forum is rarely disturbed. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981) (presumption overcome "only when the private and public interest factors clearly point towards trial in the alternative forum."); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947) ("[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."). This presumption is particularly strong where, as here, the plaintiff chooses the forum of its corporate headquarters. See, e.g., Young v. Canadian Nat'l. Ry. Co., No. Civ. A. 02-2057 2003 WL 133220 (D. La. Jan. 15, 2003).

TnT makes three arguments in support of its transfer motion: (1) convenience of parties based on TnT's California activities and a small Sensitech office; (2) convenience of witnesses and ability to compel testimony by unnamed TnT witnesses in California; and (3) the interests of

-15-

justice given Sensitech's purported "unwarranted and malicious allegations" and a lawsuit filed by TnT in the Central District of California simultaneously with its transfer motion. None of these arguments overcomes the strong deference accorded the plaintiffs' choice of forum.

## A.    The Convenience Of Parties Does Not Favor California.

As demonstrated above, TnT's sales and other activities are not limited to California. Instead, TnT operates sales and rebate programs with companies across the country, including here in Massachusetts. See, supra, § I. Even if TnT's activities were limited to California, however, transferring this case to California would not further the convenience of the parties but instead would only improperly shift the burden of litigating in a distant forum to Sensitech. See, e.g., Brian Jackson & Co. v. Eximias Pharm. Corp., 248 F. Supp.2d 31, 38 (D.R.I. 2003 (citing Van Dusen v. Barrack, 376 U.S. 612 (1964) ("Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient."))). As TnT itself concedes, "[i]f the balance is equal or only slightly in favor of the movant, the court should not transfer the case." (TnT Mem. at 16.)

Sensitech is based in Massachusetts, where the company was founded and has its corporate headquarters, including 112 employees. (DiRubio Decl. ¶ 24.) Sensitech's senior management, officers, accounting, product development, assembly and engineering personnel are based in Beverly, Massachusetts. (Id.) Plaintiff Donald Berrian also resides in Massachusetts, specifically, in Topsfield. (Compl. at ¶ 2.) The invention claimed in the '200 Patent was developed in Massachusetts. Given the plaintiffs' multiple ties to Massachusetts, transferring this case to California will not further the convenience of the parties.

Sensitech does have a small office located in Fresno, California. (DiRubio Decl. ¶ 25.) Rather than being, as TnT contends, a "major center of operations," however, the Fresno office is a small distribution point having only three employees --1 full-time office manager/customer

service representative, 1 full-time delivery driver, and 1 part-time shipping/inventory clerk. (Id.) Sensitech has two other similarly sized and staffed offices in California and sales representatives who work out of their homes. (Id. ¶¶ 25-26.) Contrary to TnT's statements (Mem. at 18), *none* of Sensitech's employees in California is expected to be a witness in this case. (Id. ¶ 27.) Sensitech also has a facility in Redmond, Washington, which houses several sales management employees and Sensitech's separate product line operation. (Id. ¶ 28.) Although it is conceivable that Sensitech's sales management employees from Washington could be called to testify, they are located more than *1100 miles* from the Central District of California. Moreover, Massachusetts is a more convenient forum for them because they regularly travel to Sensitech's headquarters in Beverly, on average once per month. (Id.; Vaught Decl. ¶ 12.)

In sum, Sensitech's limited California contacts completely fail to tip the balance of conveniences in favor of that forum.

## B.    The Convenience Of Likely Witnesses Does Not Favor California.

TnT argues in conclusory fashion that convenience of witnesses strongly favors transfer, but fails to name a single specific witness who would be so inconvenienced. "[W]hen a party seeks to transfer on account of the convenience of witnesses . . ., he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." Factors, Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 218 (2d Cir. 1978). TnT completely fails to meet this standard and, accordingly, has failed to meet its burden to show that convenience of witnesses strongly favors California. See Brian Jackson & Co., 248 F. Supp.2d at 39 (denying motion to transfer where defendant failed to specify witnesses or describe expected testimony); Soc'y of Lloyd's v. Carter, No. C.V. 02-452-M, 2003 WL 13387087, at *3 (D.N.H. March 14, 2003) (same). TnT's bald assertions of inconvenience to unnamed witnesses cannot "meet the 'substantial burden' of demonstrating a need for transfer." Talarico v. Marathon Shoe Co., No.

C.V. 00-239-P-C, 2001 WL 366346, at *7 (D. Me. 2001); Demont & Assoc. v. Berry, 77 F. Supp.2d 171 (D. Me. 1999).

In contrast, Sensitech's expected witnesses are located in Massachusetts. Among these expected witnesses is Peter Nunes, Sensitech's Director of Engineering, who is also one named inventor of the '200 Patent. (Cmplt. Ex. A.) Three of the four additional named inventors, namely, Donald Berrian (Topsfield), Ernest Santin (Beverly), and John Vanderpot (Rockport), reside here. (DiRubio Decl. ¶ 24.)[10] The attorneys that prosecuted the '200 Patent, Lappin and Kusmer, are local, as are Sensitech's financial personnel and senior management, including its CEO, Eric Schultz. (Id.) All of Sensitech's documents relating to the invention, including engineering documents, are also located in Massachusetts. (Id.)

In fact, the presence here of such non-party witnesses makes this forum *more* convenient to TnT, because it brings these witnesses within the Court's trial subpoena power. In contrast, TnT has not named a single one of its expected non-party witnesses without whom "its defense will be unduly and unfairly prejudiced." (Def. Mem. at 18.)

## C.     The Interests Of Justice Do Not Favor California.

To overcome the strong presumption in favor of a plaintiff's chosen forum, the First Circuit traditionally requires a showing of some special facts warranting transfer. As the First Circuit stated in Nowak, a plaintiff "should not be deprived of the presumed advantages of [its own choice of] jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative or legal

---

[10] The last named inventor, William Tout, is a resident of the State of Maine, for whom Massachusetts is much more convenient than is California.

problems." 94 F.3d at 720. Neither of these factors is present in this case. As discussed above, it is fair and reasonable for TnT to litigate this case in Massachusetts given its purposeful contacts with the forum and international sales activities. TnT has not shown how litigating here, give these contacts, could be oppressive or vexatious. Plaintiffs have every interest in seeking redress in this Court. Sensitech is unaware of any reason related to court administration that warrants transfer, and TnT has not specified any.[11] Thus, there are no interests of justice favoring transfer of this case.

## IV.  **Conclusion**

For all of the foregoing reasons, TnT's motion to dismiss, or in the alternative, to transfer should be denied. Should the Court have any concerns, however, Plaintiffs request limited discovery of TnT regarding its direct and indirect contacts with Massachusetts.

---

[11] The declaratory judgment action that TnT recently filed against Sensitech in the Central District of California also cannot overcome the presumption in favor of plaintiff's chosen forum. TnT filed that lawsuit on Friday August 6, one business day before it filed the instant motion to transfer. The claims in that lawsuit relate to the '200 Patent and thus this first-filed action in Massachusetts should proceed in the forum of plaintiffs' choice. See Nowak, 94 F.3d at 719-20. Plaintiffs intend to seek transfer to this District of whatever claims survive dismissal in the later-filed California action.

Respectfully submitted,

SENSITECH, INC. and DONALD W. BERRIAN

By their attorneys,

John T. Gutkoski  (BBO# 567182)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, MA 02110-3179
Telephone: (617) 345-4600
Fax: (617) 345-4745

Of Counsel:

Matthew J. Becker
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499
Telephone: (860) 275-0100
Fax: (203) 275-0343

Catherine Dugan O'Connor
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901-2047
Telephone: (203) 977-7538
Fax: (203) 977-7301

## CERTIFICATE OF SERVICE

I, John T. Gutkoski, do hereby certify that I have served the foregoing by causing copies to be hand delivered to Thomas C. O'Konski, Esq., Cesari and McKenna, LLP, 88 Black Falcon Avenue, Boston, Massachusetts 02210 on this 23rd day of August, 2004.

John T. Gutkoski



# SALES AND USE TAX
# MEMORANDUM OPINIONS

5710        SALES AND USE TAX MEMORANDUM OPINIONS
2001–1

## SUSAN LORIE TYLOCK

*A produce shipper may purchase for resale disposable temperature recording devices for the sole purpose of shipping the devices with produce the shipper sells. The produce shipper or the carrier does not make a taxable use of the devices merely by starting them in this state.*

*If, pursuant to its contract with the purchaser, the produce seller ships the device with the produce to an out-of-state point, the produce shipper's sale of the device is an exempt sale in interstate commerce under Revenue and Taxation Code section 6396.*

### BEFORE THE STATE BOARD OF EQUALIZATION
### OF THE STATE OF CALIFORNIA

*In the Matter of the Petition for Redetermination under the Sales and Use Tax Law of* SUSAN LORIE TYLOCK *Petitioner*

*Appearances:*

| | |
|---|---|
| *For Claimant:* | David Colker, Attorney |
| *For Business Taxes Appeals Review Section:* | Susan Wengel |
| | Assistant Chief Counsel |
| *For Sales and Use Tax Department:* | Gary J. Jugum, Assistant Chief Counsel |
| | Warren Astleford, Senior Tax Counsel |

### MEMORANDUM OPINION

Before the Board in this case is the application of sales tax to petitioner's charge for disposable temperature recording devices (temperature recorders) which petitioner sold to shippers of perishable agricultural produce. The function of the temperature recorders petitioner sold was to track and record temperatures of the produce while it was in possession of a common carrier who transported the produce in a conveyance (e.g., vehicle or rail car) from the produce shipper to the produce purchasers.

The temperature recorders are capable of recording temperatures over a period of 10, 15, or 30 days. Generally, the produce purchaser uses the data from the temperature recorder to verify whether the common carrier maintained the proper temperature inside the vehicle or rail car in which the carrier transported the produce. For example, if the produce were to reach the destination damaged, the purchaser could determine from recordings made by the temperature recorder whether the damage was caused by the carrier's failure to maintain proper temperature levels in the vehicle or freight car during transportation.

SALES AND USE TAX MEMORANDUM OPINIONS            5711
                                                                                  2001–1

**SUSAN LORIE TYLOCK (Contd.)**

In a typical transaction, petitioner purchased a temperature recorder from the manufacturer and sold it to a produce shipper who had a contract to supply produce to an out-of-state buyer. The produce shippers separately listed on their invoice to the purchaser the charge for the temperature recorder and the charge for the produce. In all cases in issue, the produce shippers were required to ship the produce and the temperature recorders to a point outside of this state. The produce shippers contracted with the common carriers to perform that transportation. The produce shipper marked the recorders for identification purposes and either started the recorders when the recorders were placed on the carrier's conveyance or merely transferred possession of the temperature recorder to the carrier's employee who would start the recorder on the conveyance.

If the carrier delivered the produce to the out-of-state destination damaged, the produce purchaser shipped the temperature recorder to the recorder's manufacturer which interpreted the recorded temperature data. The produce buyer could then determine if it had evidence to support a claim for damages against the carrier for not maintaining the proper temperature of the perishable goods. If the produce arrived at the destination undamaged, the produce buyer could discard the temperature recorder or could return it to the manufacturer for a "refund allowance". The recorders were never returned to petitioner, the produce shipper, or the carrier.

## OPINION

We conclude that petitioner's sales of temperature recorders to produce shippers were nontaxable sales for resale; that is, the produce shipper purchased the temperature recorders to sell to the purchaser of the produce to whom the produce and the temperature recorders were shipped. We found that neither the produce shipper nor the carrier made a use of the temperature recorders merely by starting them in this state on the carrier's vehicle or rail car.

We conclude that the produce shippers were required, pursuant to their contract with the produce buyers, to ship the temperature recorders to a point outside of this state and did so ship the temperature recorders to the out-of-state point by means of the common carrier of the produce. Accordingly, the produce shippers' sales of the temperature recorders to the out-of-state produce buyers were exempt sales in interstate commerce under Revenue and Taxation Code section 6396.

Done at Sacramento, California, this 25th day of February, 1999.

Dean F. Andal, Member

Claude Parrish, Member

John Chiang, Member